IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

|  |  |  |
|---|---|---|
| ANTHONY B. SULLERS, SR., | ) ) ) | |
| *Plaintiff*, | ) ) | Case No. 20 C 7696 |
| v. | ) ) | Judge Virginia M. Kendall |
| INTERNATIONAL UNION OF ELEVATOR CONSTRUCTORS LOCAL 2, | ) ) ) ) | |
| *Defendant*. | ) ) ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Anthony B. Sullers Sr. states that he was a victim of racial discrimination when his employer ThyssenKrupp Elevator ("TKE") fired him. Despite this injustice, Sullers alleges that his union, International Union of Elevator Constructors, Local 2 ("IUEC"), actively sabotaged his attempts for relief and sought to protect TKE's discriminatory behavior. (Dkt. 27). Naturally, IUEC disagrees with Sullers's position and filed this motion for summary judgment [65], arguing that IUEC faithfully represented Sullers in his grievance process. For the following reasons, IUEC's motion for summary judgment [65] is granted.

## BACKGROUND

IUEC is the Chicago-area affiliate of an "international labor organization that represents elevator mechanics, apprentices, and helpers throughout the United States and Canada." (Dkt. 70 ¶ 1). IUEC entered a collective bargaining agreement with a multiemployer bargaining group called National Elevator Bargaining Association ("NEBA"), which includes TKE. (*Id.* at ¶ 2). Under the IUEC-NEBA agreement, any "difference or dispute regarding the application and construction" of the agreement "shall be referred to as a 'grievance.'" (*Id.* at ¶ 9).

1

Anthony B. Sullers Sr. is an African American man and IUEC member. (*Id.* at ¶ 4). Sullers was one of four African American mechanics working at TKE. (*Id.* at ¶ 10; Dkt. 74 ¶ 3). According to Sullers, TKE's foreman, William Andriopolus, subjected Sullers and the other African American employees to racial and sexual harassment. (Dkt. 71-2 ¶ 3; Dkt. 74 ¶¶ 4–8).

On or about November 19, 2018, TKE supervisor Anthony Doyle told Sullers and his apprentice, another African American employee Rick Taylor, that TKE did not have any work for them and asked the two to "sit at home." (Dkt. 70 ¶ 10; Dkt. 74 ¶ 11). About a week later, Sullers and Taylor met with Doyle to discuss returning to work and Doyle stated that they were next in line. (Dkt. 70 ¶ 11). On or about December 7, 2018, while Sullers was still not working, TKE hired a white mechanic in a different department. (*Id.* at ¶ 12; Dkt. 74 ¶ 12). Around the same time, Sullers and Taylor visited IUEC and informed the union that they had been laid off by TKE. (Dkt. 70 ¶ 13). Juan Gonzalez, a union business representative, informed Sullers that the IUEC would file a grievance on his behalf because TKE fired Sullers while the company was slow but then hired another mechanic. (*Id.*) At the same meeting, Sullers told IUEC local president John Valone that Sullers felt TKE was discriminating against him and intended to file a complaint with the Equal Employment Opportunity Commission ("EEOC"). (Dkt. 68-1 at 33:13–23; Dkt. 70 ¶ 14). Valone suggested that Sullers file a complaint with the Illinois Department of Human Rights ("IDHR"). (Dkt. 68-1 at 33:13–23; Dkt. 70 ¶ 14).

On December 11, 2018, IUEC filed grievances on behalf of Sullers and Taylor. (Dkt. 68-9 at 1; Dkt. 70 ¶ 15). The IUEC grievance form asks the grievant to fill in the "statement of grievance" and the "remedy requested." (Dkt. 68-9). On Sullers's form, the statement of grievance was that Doyle told Sullers to sit at home because TKE was slow, but, in an about-face, TKE hired another mechanic weeks later. (*Id.*) Sullers requested back pay for "all loss time since his last day

2

of work." (*Id.*)

Later in December 2018, IUEC settled Taylor's grievance—Taylor received backpay and returned to work at TKE.[1] (Dkt. 68-1 at 31:11–13; Dkt. 70 ¶ 16). But Gonzalez and Doyle could not resolve Sullers's grievance. (Dkt. 70 ¶ 17).

At some point, Valone replaced Gonzalez in handling the negotiations with TKE. (*Id.*) Around January 16, 2019, Sullers filed an employment discrimination charge against TKE with the IDHR. (*Id.* at ¶ 19). About a week later, Valone relayed TKE's settlement offer—$14,000 in backpay and reinstatement at TKE, but Sullers must drop his IDHR claim. (*Id.* at ¶ 20). Sullers was unwilling to abandon it and declined the offer. (*Id.*) On January 28, 2019, Valone informed Sullers that TKE agreed to reinstate him despite the active grievance. (*Id.* at ¶ 21). Sullers restarted work at TKE on February 1, 2019. (*Id.*) A week later, on February 8, 2019, Valone relayed a second settlement offer to Sullers—backpay of $18,031.80, contingent on Sullers dropping his IDHR claim. (*Id.* at ¶ 22). Sullers, again, declined the offer. (*See id.* at ¶¶ 22–24).

According to Sullers, and denied by IUEC, Valone stepped into the negotiations to intimidate Sullers, including threatening him and "deploy[ing] a screaming rant that nothing would be done for Sullers unless and until he agreed to drop his [IDHR] charges against TKE." (Dkt. 74 ¶¶ 20–22).[2] Moreover, Sullers attests that IUEC retaliated against him by refusing to return his

---

[1] Sullers objects to IUEC's statement that Taylor was awarded backpay because IUEC provides no citation support. But Sullers testified that Taylor told Sullers that he received backpay.

[2] Sullers states that Valone also threatened to prevent Sullers from ever working in the elevator industry and points to his responses to IUEC's interrogatories Nos. 1 and 2. (Dkt. 74 ¶ 21). Nothing in those responses indicate that Valone threatened to blacklist or prevent Sullers from reentering the industry. (*See generally* Dkt. 73-4). Sullers only states that IUEC is currently blocking his efforts to find a job as an elevator mechanic. (*Id.* at No. 1 ¶ 12).

Sullers also cites to his responses to IUEC's interrogatories but accidentally attached his responses to TKE's interrogatories. IUEC filed the correct set in its reply brief but objected to Sullers's reliance on them because they are unsigned and unverified. The Court will consider Sullers's citations because he did separately certify those responses to IUEC's interrogatories when he incorrectly attached the wrong responses. (Dkt. 71-3 at 18).

3

hone calls, text messages, and emails, (*id.* at ¶ 24), but Sullers also admits in his deposition that during the grievance process, "whenever Sullers reached out to Gonzalez with a question or concern, Gonzalez responded." (Dkt. 68-1 at 108:23–109:2; Dkt. 68-6 ¶ 6; Dkt. 70 ¶ 18).

On December 23, 2019, Sullers asked Gonzalez about the status of his grievance and Gonzalez replied that he was no longer handling the process and Sullers would need to contact Valone. (Dkt. 70 ¶ 23). When Sullers contacted Valone for an update, Valone replied that TKE made an offer, but Sullers refused to accept it. (*See* Dkt. 68-1 at 44:15–21; Dkt. 70 ¶ 24). Sullers argued that the grievance was separate from the IDHR filing and IUEC should still be fighting on his behalf, in which Valone responded that IUEC did not get involved if there were legal issues. (Dkt. 68-1 at 44:22–45:3). Sullers confronted Valone on whether such a policy was in the IUEC-NEBA agreement, to which Valone said no. (*Id.* at 45:4–9). The conversation ended and Sullers proceeded to call Eddie Christensen, IUEC's regional director, who reiterated Valone's position that the IUEC cannot force TKE to settle Sullers's grievance and pay him. (*Id.* at 45:16–23; Dkt. 70 ¶ 24). On December 31, 2019, IUEC submitted Sullers's grievance for arbitration with the National Arbitration Committee. (Dkt. 70 ¶ 25).

On January 11, 2020, Sullers filed a charge against IUEC with the National Labor Relations Board ("NLRB"), alleging that IUEC refused to represent him in his grievance. (*Id.* at ¶ 26). About a month later, Valone confirmed with Sullers that his grievance was pending before the National Arbitration Committee. (*Id.* at ¶ 27). On March 4, 2020, NLRB dismissed Sullers's charge because there was insufficient evidence to establish that IUEC had refused to process his grievance. (Dkt. 68-19; Dkt. 70 ¶ 28). On April 24, 2020, TKE emailed IUEC stating that the company reinstated their previous offer for full backpay but withdrew their request requiring Sullers to dismiss his IDHR claim. (Dkt. 70 ¶ 30). That same day, James Bender, IUEC's assistant general president,

4

sent an email to Christensen and Gonzalez stating that TKE was unlikely to offer anything better and Bender was inclined to accept it. (Dkt. 68-20). [3]

Under Written Step Two of Sullers's grievance form, IUEC responded that it was willing to accept TKE's standing offer to pay Sullers $18,031.80, with TKE signing the grievance on April 27, 2020 and IUEC signing on May 20, 2020. (Dkt. 69-9). Around June 10, 2020, IUEC and TKE settled Sullers's grievance and backpay of $18,031.80, minus taxes, was directly deposited into Sullers's bank account. (Dkt. 70 ¶ 31). Sullers returned the money because he did not know if acceptance required him to drop his IDHR claim. (*Id.*) That same day, Gonzalez told Sullers that IUEC settled his grievance with TKE. (*Id.*) On October 13, 2020, TKE sent a letter to Sullers stating that his grievance had been settled and again, deposited the backpay into Sullers's account. (*Id.* at ¶ 32). Sullers responded to TKE that he could not accept the backpay because he did not intend to drop his IDHR suit and the money was deposited into his account without "proper notice." (*Id.* at ¶ 33). TKE then sent the money to IUEC who, through its counsel, transferred the money to Sullers's counsel. (*Id.* at ¶ 34). Sullers is still pursuing his IDHR claim against TKE in state court. (*Id.* at ¶ 35).

Separately, on June 3, 2020, Sullers filed a complaint against the IUEC with the EEOC. (Dkt. 68-28; Dkt. 70 ¶ 29). On July 7, 2020, Sullers filed an IDHR and a second EEOC complaint against IUEC. (Dkt. 68-29). [4]

## LEGAL STANDARD

Summary judgment is proper when the pleadings, the discovery and disclosure materials

---

[3] Sullers objects to IUEC's reliance on Bender's email, (Dkt. 68-20), because it cannot sustain the proposition that Sullers was aware of TKE's new offer. But nowhere within IUEC's fact statement does it say that Sullers was aware of TKE's offer. Rather, its only purpose is to show that on April 24, 2020, TKE reinstated its prior offer but dropped the IDHR condition.

[4] IUEC states that on July 7, 2020, Sullers filed a second claim against TKE with IDHR and EEOC. (Dkt. 70 ¶ 29). But looking at the filed complaint, the claim appears to be targeted at IUEC.

on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56. In determining whether a genuine issue of material fact exists, the Court must view the evidence and draw all reasonable inferences in favor of the nonmoving party. *See Lewis v. Ind. Wesleyan Univ.*, 36 F.4th 755, 759 (7th Cir. 2022). The nonmoving party "must go beyond the pleadings" to demonstrate evidence "upon which a jury could properly proceed to find verdict in their favor." *Modrowski v. Pigatto*, 712 F.3d 1166, 1168–69 (7th Cir. 2013). "The existence of a mere scintilla of evidence, however, is insufficient to fulfill this requirement." *Wheeler v. Lawson*, 539 F.3d 629, 634 (7th Cir. 2008). "[C]onclusory statements, not grounded in specific facts, are not sufficient to avoid summary judgment." *Bordelon v. Bd. of Educ. of the City of Chicago*, 811 F.3d 984, 989 (7th Cir. 2016).

## DISCUSSION

To begin, Sullers's state-law claims implicate IUEC's representation in his grievance process and are preempted by federal labor laws. (Dkt. 24); *see Vaca v. Sipes*, 386 U.S. 171, 177 (1967) ("It is obvious that Owens' complaint alleged a breach by the Union of a duty grounded in federal statutes, and that federal law therefore governs his cause of action."); *Fuqua v. U.S. Postal Serv.*, 979 F. Supp. 2d 850, 859 (N.D. Ill. 2013). Therefore, the Court reviews the parties' summary judgment briefing under IUEC's federal law duty of fair representation.[5]

A union "has broad authority as the exclusive bargaining agent for a class of employees." *Garcia v. Zenith Elecs. Corp.*, 58 F.3d 1171, 1175 (7th Cir. 1995). At times, a union must make decisions that benefit the collective action at the expense of the individual. *Id.* at 1176. Therefore, it "is accorded considerable discretion in dealing with grievance matters." *Id.* But, as a floor, a

---

[5] Sullers argues that IUEC's motion for summary judgment should also be denied because it failed to abide by the District's meet and confer requirements for summary judgment practice. (Dkt. 71-5). The Court is not aware of any such requirement under Local Rule 56.1 or in its own standing orders. Sullers's perceived procedural flaw in IUEC's motion-practice is a requirement under Judge Ellis's summary judgment practice and thus, holds no sway here.

union has a "concomitant duty of fair representation to each of its members." *Id.* (quoting *Cleveland v. Porca Co.*, 38 F.3d 289, 295 (7th Cir. 1994)). A union breaches that duty of fair representation "if its actions are (1) arbitrary, (2) discriminatory, or (3) made in bad faith." *Bishop v. Air Line Pilots Ass'n, Int'l*, 900 F.3d 388, 397 (7th Cir. 2018). "A plaintiff is successful in pleading a breach of the duty of fair representation if he plausibly pleads a breach under *any* of the three prongs," and "each prong must be considered separately" because "[t]he appropriate inquiry under each of these prongs is somewhat different." *Id.* (internal citations and quotation marks omitted).

A "union's actions are arbitrary only if, in light of the factual and legal landscape at the time of the union's actions, the union's behavior is so far outside a wide range of reasonableness, as to be irrational." *Rupcich v. United Food & Com. Workers Int'l Union*, 833 F.3d 847, 854 (7th Cir. 2016) (citing *Air Line Pilots Ass'n, Int'l v. O'Neill*, 499 U.S. 65, 78 (1991)). "Determining whether a union's actions are arbitrary under this standard requires 'an objective inquiry.'" *Id.* (quoting *Neal v. Newspaper Holdings, Inc.*, 349 F.3d 363, 369 (7th Cir. 2003)). But in performing this inquiry, courts apply an "extremely deferential standard" and will not substitute its judgment "for that of the union, even if with the benefit of hindsight, it appears that the union could have made a better call." *Id.* (cleaned up). Therefore, a plaintiff must prove that (1) their "position is not just as plausible as the union's, but to show that the union's position could eventually be deemed not even colorable" and (2) they were "actually harmed by the union's actions," "demonstrating the outcome would probably have been different but for the union's activities." *Id.* (cleaned up).

To determine whether a union's actions are discriminatory or in bad faith, the court performs a subjective inquiry into the union's motives. *Bishop*, 900 F.3d at 398. "[A] claim of discrimination or bad faith must rest on more than a showing that a union's actions treat different

7

groups of employees differently." *Id*. The plaintiff must show that the union acted, or failed to act, "due to an improper motive." *Neal*, 349 F.3d at 369. Discriminatory or bad faith conduct must be "intentional severe, and unrelated to legitimate union objectives." *Bishop v. Air Line Pilots Ass'n Int'l*, 5 F.4th 684, 694 (7th Cir. 2021) (quoting *Amalgamated Ass'n of Street, Elec. Ry. & Motor Coach Emps. of Am. v. Lockridge*, 403 U.S. 274, 301 (1971)). Improper motives can include race or sex discrimination or encompass fraud, dishonesty, or other intentionally misleading conduct. *Id.* at 694–95. For example, a union would act in bad faith if "it disfavor[s] members who supported a losing candidate for union office," "makes decisions for no apparent reason other than political expediency," or decides "solely for the benefit of a stronger, more politically favored group over a minority group." *Bishop*, 900 F.3d at 398–99. But the Seventh Circuit cautions courts not to "expand[]the realm of discriminatory or bad faith actions much beyond these narrow categories" because it would conflict with the "broad deference [due] to union leaders in solving intractable problems in distributive justice." *Id.* at 404 (Hamilton, J. concurring in judgment).

Here, Sullers does not lay out which facts are evidence of arbitrariness, discrimination, or bad faith. His overarching position is that IUEC's decisions (1) not to investigate and pursue his racial discrimination grievance and (2) then to stymie the resolution of his 2018 layoff grievance violate all three prongs. To start, Sullers asserts that IUEC protects and enables TKE's discrimination against African Americans. For support, he states that the union was fully aware of TKE's discriminatory behavior and points to various excerpts from Gonzalez's testimony to suggest IUEC would do nothing if TKE fired all its African American employees. (*See, e.g.*, Dkt. 68-3 at 32:11–22). IUEC also pressured him to drop his IDHR suit, Sullers continues, when it replaced Gonzalez, a Hispanic man, with Valone, a Caucasian man, who allegedly intimidated and screamed at Sullers that nothing would be done about his 2018 layoff grievance if he did not

8

comply. When Sullers stood firm, he contends that IUEC cut off all communications with him, and he was forced to file a complaint with the NLRB, stating that IUEC refused to process his grievance. To thwart any NLRB investigation, IUEC purportedly lied that Sullers's grievance was pending arbitration and then prevented Sullers from testifying on the record about TKE's discrimination.

Considering Sullers's arguments, the Court feels compelled to refocus the parties. Sullers's grievance form—that he filled out—does not mention any racial discrimination. (Dkt. 68-9). Instead, it states that Doyle told Sullers to stay at home because TKE did not have work for Sullers, but then, the company hired another mechanic. (*Id.*) That layoff was the issue submitted to IUEC to initiate the grievance process. Sullers retorts that IUEC refused to investigate or pursue a racial discrimination grievance, but that proposition finds no support in the record. First, Sullers has not presented a grievance form separate from the 2018 layoff one, which does not mention any racial discrimination. Second, Sullers has testified that there was only one instance where IUEC declined to file a grievance on Sullers's behalf back in 2007. (Dkt. 68-1 at 21:21–22:21). By his own words, Sullers concedes that IUEC has not declined to file any other grievances on his behalf. Third, Sullers cites to Gonzalez's deposition for support, but he misquotes and contorts Gonzalez's words. In his statement of material facts, Sullers states that IUEC "refused [his] request" to pursue a racial discrimination grievance, but he cites to a line where Gonzalez only said that IUEC did not file one. (Dkt. 74 ¶ 15; Dkt. 73-2 at 106:8–13). Sullers cannot impute intent if it is unsupported by the record. He also points to Gonzalez's deposition where Sullers's counsel stated: "the union did its due diligence and I think you were suggesting [sic] didn't find any merit in Mr. Sullers' claim of racial discrimination," to which Gonzalez said that was accurate. (Dkt. 71 at 8; Dkt. 71-4 at 106:25–107:11). But further down in the transcript, Gonzalez clarifies that the racial

9

discrimination claim lacked merit and did not warrant investigation because Sullers never raised the issue in his grievance form or any other paperwork. (Dkt. 71-4 at 108:9–24). Sullers is putting the cart before the horse by asking IUEC to investigate and pursue a grievance that Sullers never requested.

Rather telling, Sullers could have included the racial discrimination issue in his 2018 layoff grievance but chose against it. On the same day that Gonzalez told Sullers that IUEC would file a grievance on his behalf, Sullers told Valone that he "intended to file a complaint with the EEOC because TKE had racially discriminated against him." (Dkt. 70 ¶ 14). Valone then suggested that Sullers file a complaint with the IDHR. (*Id.*) This conversation shows that Sullers had the opportunity and knowledge of the racial discrimination to file it through the grievance process but chose to seek remedies within the legal system, where IUEC would not be involved. Therefore, IUEC's decision not to pursue a racial discrimination grievance cannot be arbitrary if Sullers failed to submit any paperwork to initiate the grievance process.

Sullers's argument suggests that because IUEC knew of TKE's discriminatory actions, the union itself discriminated against Sullers or acted in bad faith by not proactively investigating the circumstances behind his layoff. He points to Gonzalez's deposition where Gonzalez testified that if all TKE's African Americans employees were fired, it would not trigger IUEC to investigate into possible racial motives because IUEC does not have the power to dictate who TKE hires or fires. (Dkt. 68-3 at 32:11–22). But it is unclear what exactly Sullers wants IUEC to do. A union, as an employee's bargaining agent, must fairly represent the employee in grievances. *See Garcia,* 58 F.3d at 1176. At most, Sullers can fill out a racial discrimination grievance form—which Sullers has not done—and IUEC can file it, but IUEC does not have a legal responsibility or the practical capability to prevent or eliminate racial discrimination within TKE. *E.E.O.C. v. Pipefitters Ass'n*

10

*Loc. Union 597*, 334 F.3d 656, 659–60 (7th Cir. 2003) ("Suppose that a union is lackluster, and while it will file a grievance if pressed to do so by a member of the collective bargaining unit, it will do nothing on its own initiative. We do not understand how such passivity, though it means the union will not take measures to prevent racial harassment on its own initiative, could be thought a form of racial discrimination…").[6]

More critical to the subjective inquiry, Sullers has not shown that IUEC takes his grievances, racial discrimination or otherwise, less seriously than those submitted by employees of other races. He has not pointed to any evidence to suggest that IUEC categorically refuses to pursue racial discrimination grievances on behalf of African Americans. It bears repeating that Sullers reported in his grievance form that he was laid off because TKE said work was slow, but then the company hired another mechanic. He presented his claim as a run-of-the-mill improper layoff, not a racially motivated one. So IUEC's decision to pursue exactly what Sullers had submitted cannot be construed as discriminatory or done in bad faith.

Turning to the 2018 layoff grievance, Sullers has similarly not presented any evidence to suggest that IUEC acted arbitrarily or irrationally. Rather, the record reflects that IUEC achieved the exact result permitted under the IUEC-NEBA agreement. IUEC negotiated to reinstate Sullers as a mechanic less than three months after he was laid off and presented two settlement offers from TKE—backpay, $14,000 and then $18,031.80, in exchange for dropping the IDHR suit. Sullers refused both times, at which point, the parties came to impasse. As Sullers acknowledges, IUEC

---

[6] Although *E.E.O.C. v. Pipefitters Ass'n Loc. Union 597* involved claims under Title VII and 42 U.S.C. § 1981, the Court finds its logic persuasive and applicable in the context of union's duty of fair representation. The Title VII inquiry—whether the union discriminated the union member based on race or sex—bears resemblance to the inquiry behind discriminatory or bad-faith actions in a union's duty of fair representation. *See, e.g.*, *E.E.O.C.*, 344 F.3d at 661 (noting that if a union files a grievance for a white worker but not for a black worker, the union violates Title VII and its duty of fair representation); *Young-Smith v. Bayer Health Care, LLC*, 788 F. Supp. 2d 792, 802 (N.D. Ind. 2011) ("The duty of fair representation and Title VII plainly overlap in that they both prohibit discrimination…" (citation omitted)).

11

cannot force TKE to settle the grievance. Even then, IUEC continued to advocate for Sullers by submitting his grievance to arbitration. Eventually, TKE caved and settled Sullers's grievance by providing backpay without requiring Sullers to drop his IDHR suit.

Nor was IUEC's decision to settle the grievance short of arbitration without Sullers's approval arbitrary. First, a union is not obligated to take all grievances to arbitration. *Matthews v. Milwaukee Area Local Postal Workers Union, AFL–CIO*, 495 F.3d 438, 442 (7th Cir. 2007); *see also Vaca*, 386 U.S. at 191–92 ("If the individual employee could compel arbitration of his grievance regardless of its merit, the settlement machinery provided by the contract would be substantially undermined…. [W]e conclude that a union does not breach its duty of fair representation, and thereby open up a suit by the employee for breach of contract, merely because it settled the grievance short of arbitration."). Settlement was a reasonable alternative because TKE withdrew its condition to require Sullers to drop his IDHR claim. That requirement was the sole roadblock preventing any resolution, but now gone, IUEC believed that accepting the new offer was the best possible result for all parties. (*See* Dkt. 68-1 at 65:20–22 ("Q: And what remedies were you looking for through an arbitration? A: To receive my money.").

Second, when Sullers joined IUEC, he made it his exclusive bargaining agent and surrendered his right to control the settlement process. *See Rupe v. Spector Freight Sys., Inc.*, 679 F.2d 685, 691 (7th Cir. 1982); *see also Hardwick v. Sunbelt Rentals, Inc.*, 430 F. App'x 536, 539 (7th Cir. 2011) ("The members' influence comes through their right to approve CBAs and elect officers. Once elected, the officers may act on behalf of each member, and the membership as a whole."). Therefore, IUEC does not require Sullers's approval to settle his grievance. *See, e.g.*, *Shane v. Greyhound Lines, Inc.*, 868 F.2d 1057, 1061 (9th Cir. 1989) ("Unions are free to negotiate and accept settlements even without the grievants' approval."); *Olson v. Bemis Co.*, 2014 WL

12

1576786, at *9 (E.D. Wis. Apr. 17, 2014) (noting that the authority to pursue and settle grievances is "consistent with the well-established principle that employee grievances under a CBA belong to the union and not to the aggrieved employee").

Further foreclosing his argument, Sullers fails to articulate how, in the but-for world, the outcome would have been different. *See Rupcich*, 833 F.3d at 854. Sullers argues that his backpay settlement did not include interest, but he has provided no evidence to suggest that he could have won and received more money from TKE through arbitration. Rather, the backpay amount represents the "full amount of contractual damages that could be obtained via the grievance process." (Dkt. 68-17; *see also* Dkt. 68-20 (commenting to the internal IUEC team that TKE was likely not going to make a better offer)). While Sullers appears frustrated with the result of the settlement, "[d]eclining to pursue a grievance as far as a union member might like isn't by itself a violation of the duty of fair representation." *Yeftich v. Navistar, Inc.*, 722 F.3d 911, 916 (7th Cir. 2013; *Griffin v. Air Line Pilots Ass'n, Int'l*, 32 F.3d 1079, 1083 (7th Cir. 1994) ("It is not the court's role to second-guess tactical decisions made by employees' duly appointed bargaining representative.").

Next, no reasonable juror would find that IUEC discriminated against Sullers. As discussed, the operative question is whether IUEC, not TKE, discriminated against him. Has IUEC refused to process Sullers's grievance or treated that process differently because he is black? *See E.E.O.C.*, 334 F.3d at 659. Sullers has not produced any evidence to suggest so or to link TKE's racial discrimination to his treatment by the union. *See Souter v. Int'l Union, United Auto., Aerospace & Agr. Implement Workers of Am., Loc. 72*, 993 F.2d 595, 599 (7th Cir. 1993). While Sullers can allege that IUEC is protecting TKE's continued racial discrimination, he has not marshaled forth specific facts to support that allegation, like IUEC correcting the employer's

13

mistreatment of Caucasian workers, but not of African American workers. Indeed, it was Valone who recommended Sullers to pursue a racial discrimination case with the IDHR. And IUEC filed and settled a grievance for another African American employee, Taylor, for reinstatement and backpay in less than a month. Both undisputed facts undermine Sullers's contention that IUEC has a discriminatory agenda against its African American employees.

Finally, Sullers's arguments for bad-faith conduct fail because he presents only conclusory assertions with minimal factual support. To start, Sullers presents no evidence that Valone replaced Gonzalez in the negotiation process to intimidate Sullers and send "a clear message" that Sullers would face TKE and the "Caucasian elite of the Union" in pursuing his grievance. (Dkt. 71 at 9). He cites to his interrogatory answers, which states, without supporting facts, that Valone was hostile to Sullers and supportive of TKE's racist policies. (Dkt. 73-4 at 2). For example, he points to Valone's attempts at intimidating Sullers to dismiss his IDHR charge against TKE. But the record shows that TKE, not IUEC, demanded that dismissal. IUEC was only the middleman communicating the offers. The bad-faith, and discriminatory, subjective inquiry looks to what improper motives the union has—not what the grievant believes. So while Sullers can believe Valone was motivated to aid and abet TKE's racial discrimination, Sullers has not presented evidence to show that Valone was motivated to do so. *See, e.g.*, *Eng. v. Serv. Emps. Int'l Union, Loc. 73*, 458 F. Supp. 3d 948, 957 (N.D. Ill. 2020) (finding that "bare assertions" of plaintiffs' "state of mind," without more, do not support the existence of an improper motive (quoting *Yeftich*, 722 F.3d at 916)). And Sullers's deposition cites similarly fail to indicate any intimidation or hostility. (*See* Dkt. 70 ¶ 22; Dkt. 68-1 at 34:12–16, 25; 35:1-5; 50:24–51:18). At best, they only show that Valone conveyed TKE's settlement offer and Sullers declined to accept it.

Even if the Court accepts Sullers's version of the facts as true—that Valone was hostile

14

and screamed at Sullers that nothing could not be done about this grievance if he did not drop his IDHR suit—it alone does not mean that the union acted in bad faith. *See Bishop*, 5 F.4th 684 at 697 ("[I]t is not necessarily appropriate to look at a single officer's conduct to determine the reasons that the union acted because the individual officer's 'motivations are not always the same as the motivations of the union as a whole.'" (quoting *Barton Brands, Ltd. v. N.L.R.B.*, 529 F.2d 793, 798 (7th Cir. 1976))); *see, e.g.*, *Filippo v. N. Indiana Pub. Serv. Corp.*, 141 F.3d 744, 750 (7th Cir. 1998) (noting that union president's statement that she believes plaintiff is a backstabber is not linked to how the union handled plaintiff's grievances); *Treuer v. Shop-Rite, Inc.*, 35 F. Supp. 2d 678, 691 (E.D. Wis. 1999) (finding no improper motive where union business representative yelled profanities at grievant and threatened to never arbitrate the grievance because grievant failed to show that the union acted in bad faith).

While Valone could have been unpleasant, Sullers has not connected Valone's volatile actions to how IUEC treated his grievance. Sullers rebuts by pointing to the prolonged lack of movement in the grievance process between February and December of 2020, but he fails to provide any evidence that such inactivity was due to some improper motive by IUEC. More likely, the lack of progress comes from intransigence on both sides: TKE and Sullers refusing to back down from their positions. Again, IUEC cannot force TKE to settle a grievance. Indeed, after the supposed rant, IUEC did not dismiss his grievance. IUEC did not accept a settlement with terms requiring Sullers to abandon his IDHR suit. IUEC did not abandon the grievance process but rather submitted it for arbitration before the National Arbitration Committee. Eventually, TKE gave Sullers his full backpay without requiring him to drop his IDHR suit. All in all, the uncontroverted evidence displays dutiful representation by the union.

His other argument—that IUEC cut off communication with him when he refused to drop

15

his IDHR claim—is contradicted by his own words. In his deposition, Sullers admits that throughout the grievance process, Gonzalez responded to Sullers's questions or concerns whenever Sullers reached out. (Dkt. 68-1 at 108:21–109:5). Even when Valone did not respond to Sullers, Valone requested Gonzalez to reach out to Sullers. (*Id.* at 115:5–19). While communications were far from perfect, Sullers was by no means "cut off" or abandoned by the union. *See Janky v. Lake Cnty. Convention & Visitors Bureau*, 576 F.3d 356, 362 (7th Cir. 2009) ("[L]itigants cannot create sham issues of fact with affidavits that contradict their prior depositions." (cleaned up)).

Attempting to salvage his bad-faith argument, Sullers hints at impropriety given the suspicious timings behind certain IUEC's actions. He asserts that when he filed a complaint against IUEC with the NLRB, IUEC placed the grievance in arbitration to avoid any NLRB investigation. (Dkt. 74 ¶ 25). Sullers is also suspicious of the fact that he received his backpay eight days after he filed an EEOC complaint against IUEC. (Dkt. 68-1 at 82:2–12). Those arguments have some merit if the chronologies are correct, but Sullers has them backwards. IUEC submitted Sullers's grievance for arbitration first, on December 31, 2019. Then, Sullers filed his complaint against IUEC with the NLRB on January 11, 2020. So IUEC did not lie when it said that Sullers's grievance was referred to arbitration. The correct sequence of events undercuts his argument that IUEC was attempting to avoid NLRB scrutiny when IUEC had no knowledge of any potential investigation when proceeding to arbitration. Although IUEC's decision to settle prevented Sullers from testifying about TKE's discriminatory conduct, he fails to show how that decision was the result of an improper motive. As discussed, TKE provided a new offer that IUEC believed would satisfy both parties.

And while Sullers did file an EEOC complaint on June 3, 2020—about a week before IUEC

and TKE settled Sullers's grievance—TKE made the new offer on April 24, 2020. In an internal email dated the same day, IUEC indicated that, since TKE dropped the IDHR requirement, the company would likely not make a better monetary offer and the union was inclined to accept it. (Dkt. 68-20). And a month later, on May 20, 2020, IUEC signed the grievance acknowledging its intent to accept TKE's offer. Thus, there is no indication that IUEC haphazardly threw together an offer to avoid agency scrutiny when IUEC accepted the best available settlement on the table before IUEC became aware of the EEOC complaint.

Lastly, in his response to IUEC's motion for summary judgment, Sullers alleges two additional breaches of the duty of fair representation: a December 2020 grievance based on racially discriminatory termination and IUEC blocking Sullers from reentering the elevator industry. Neither of these allegations are present in Sullers's original complaint or amended complaint. Sullers cannot prevent summary judgment by raising new arguments at the eleventh hour that are not found in the operative complaints. *Abuelyaman v. Ill. State Univ.*, 667 F.3d 800, 814 (7th Cir. 2011); *Shanahan v. City of Chicago*, 82 F.3d 776, 781 (7th Cir. 1996). Thus, the Court will not consider these new allegations.[7]

## CONCLUSION

For the foregoing reasons, IUEC's motion for summary judgment [65] is granted.

Virginia M. Kendall
United States District Judge

---

[7] Sullers makes an additional argument that he is entitled to damages because IUEC intentionally inflicted him with emotional distress. As discussed, his intentional infliction of emotional distress argument is a state law claim and thus, preempted by federal law. Separately, as the Court finds that IUEC did not breach its duty of fair representation, there are no damages to award Sullers.

Date: March 28, 2024